# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DEBRA CARNEY,                   )
)
     Plaintiff,              )
)       No. 3:13-cv-00527
v.                           )       Senior Judge Haynes
)
SUNCREST HEALTHCARE OF MIDDLE   )
TENNESSEE, LLC,                )
)
     Defendant.           )

## MEMORANDUM

Plaintiff, Debra Carney, filed this action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., against Defendant, Suncrest Healthcare of Middle Tennessee, LLC. ("Suncrest"), her former employer. Plaintiff, who was employed with Suncrest as an account manager, alleges interference with her FMLA leave and that her termination was in retaliation for her use of FMLA leave.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 38), contending, in essence, that Plaintiff cannot prove interference with her FMLA leave because Plaintiff was not denied benefits and that Plaintiff cannot prove retaliation because she cannot show a causal connection between her use of FMLA leave and her termination. In response, Plaintiff contends that she has established a prima facie showing of interference, as well as direct and circumstantial evidence of retaliation. In addition, material factual disputes exist on whether Defendant's proffered reasons for Plaintiff's discharge are pretextual.

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 38) should be granted.

## A. Findings of Fact[1]

On April 4, 2011, Plaintiff began her employment as an account manager with Defendant Suncrest Healthcare of Middle Tennessee, Inc., a home health services provider. (Docket Entry No. 41, Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts at ¶ 1; Docket Entry No. 38-5, Janene Mann Deposition at 22-23).[2] Plaintiff reported to Janene Mann, Suncrest's regional director of business development. Id. at ¶ 3. In her position, Plaintiff managed accounts with doctor's offices, hospitals, case managers and nurses, for the "purpose of getting business for the company." (Docket Entry No. 45-1, Plaintiff's Deposition at p. 41). Plaintiff was also required to solicit new accounts. Id.

In May 2012, Plaintiff received an annual evaluation. (Docket Entry No. 47-3). On a one to four scale, Plaintiff received mostly threes, that is, she "meets standards." Id. at 1-2. Plaintiff also received five ratings of fours, that is, "exceeds standards," because Plaintiff: "[d]emonstrates an attitude of teamwork and cooperation, and uses good communication skills in interfacing with peers, staff and in resolving conflicts," "[d]isplays a professional appearance and practices good personal hygiene," "[c]ontributes to a positive facility identity within the community at large," "[r]esponds effectively and efficiently to referral sources within established time frames, and maintains optimal

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes a finding of facts.

[2]The Court's citations are to the pagination in the Court's electronic case filing system. The Court's citations denoted by a "p." refer to the pagination of a deposition.

2

customer satisfaction," and "Annual Compliance Training completed." Id.; Docket Entry No. 38-17.

On June 6, 2012, Mann met with Plaintiff to discuss Plaintiff's referral numbers. (Docket Entry No. 41 at ¶ 4). Mann agreed that Plaintiff was getting referrals from her current accounts, but advised Plaintiff to solicit new accounts and to think "outside the box." (Docket Entry No. 45-1 at p. 134). Later that night, Mann sent Plaintiff an email stating that "[w]hat we have to focus on is how to build your referral base. I have already gone through several months of your referrals and will send you a meeting request so we can review these and brainstorm as to how to increase these." (Docket Entry No. 38-6 at 1). Mann explained, "[a]s you can see ... you are getting your Medicare from very few referral sources and if someone were to look at your referral base that you have to pull from which is quite extensive – this is what we need to focus on – you are going to have to let the other go and move forward." Id. Mann added, "[a]nother area to increase, obviously, is more physician referrals so you may want to think about who you can target to bring more Medicare in for you." Id.

In September 2012, Plaintiff participated in a "sales blitz" with Martee Harris, Suncrest's senior vice president of human resources. (Docket Entry No. 41 at ¶ 5). Plaintiff drove Harris to the offices of Plaintiff's accounts. (Docket Entry No. 45-5, Harris Deposition at pp. 13-14). Harris complained that Plaintiff's vehicle was "absolutely filthy" even though she knew Harris would be driving with her. Id. at p. 14; Docket Entry No. 41 at ¶ 5. Harris described Plaintiff as "very scattered" with her account and stated that Plaintiff was "more aggressive and not as assertive." Id. On September 29, 2012, Mann emailed Plaintiff about Plaintiff visiting some accounts more than once a week, cautioning her "to make sure we aren't in there too much." (Docket Entry No. 38-9

at 1). Mann advised Plaintiff that Plaintiff "could spend this time calling on other offices." Id.

Plaintiff responded that she "actually did get referrals f[rom] each of these." Id.

On October 2, 2012, Dr. Ladouceur evaluated Plaintiff for pain in her shoulder. (Docket Entry No. 41 at ¶ 7). According to Plaintiff, Dr. Ladouceur suspected that Plaintiff had a torn rotator cuff. (Docket Entry No. 45-1 at p. 64). After an exam, Dr. Ladouceur provided Plaintiff an injection for her pain, and ordered an MRI to confirm a torn rotator cuff. Id. at pp. 63-64. Plaintiff received the results of the MRI at the end of October. Id. at p. 64.

On October 15, 2012, Plaintiff did not attend an awards luncheon because she "got really, really sick." (Docket Entry No. 41 at ¶ 8; Docket Entry No. 45-1 at p. 172). Plaintiff testified that she attempted to notify Mann, but was unable to reach her by cell phone. (Docket Entry No. 45-1 at p. 172). Mann told Plaintiff that she was "very embarrassed" and "wished [Plaintiff] had called her earlier so she could have found a replacement." Id. Plaintiff was disciplined for this incident, and wrote on her reprimand that "as for not notify (sic) Janene - I was having chest pain and went to ER." (Docket Entry No. 38-12 at 1).

On October 30, 2012, Plaintiff notified Mann by email that Plaintiff would need surgery to repair her torn rotator cuff. (Docket Entry No. 41 at ¶ 10; Docket Entry No. 38-10 at 2). Plaintiff wrote, "I plan to have surg Dec 17tth[.] I will be out on PTO for 2 weeks. I thought this might be the best time as last of Dec is slow ... I will need therapy for several weeks ... Please let me know if these dates are ok[.]" (Docket Entry No. 38-10 at 2). Mann replied, "[g]lad to hear you are going to have this taken care of. Just let me know when you have the exact dates that you will be out." Id. at 1. Plaintiff responded, "spoke with MD office this evening and the plan for surg is for Dec 6[.] I will let you know if that changes[.] I woud have like a little more time to work the mo of dec

4

befiore taking off but it looks llike I will be back to get [face to face] at the end of mo[.] Ill let you know if there are any changes." Id.

On October 31, 2012, Candice Shannon, the accounts payable coordinator, emailed Mann regarding Plaintiff's email to Shannon on October 30, 2012, for issuance of certain expense checks as soon as possible. (Docket Entry No. 41 at ¶ 11; Docket Entry No. 38-8, Mann Declaration, Exhibit A at 4). Shannon advised Mann that Plaintiff had hand delivered her expense report to Shannon and had "wanted to get into why these need to be paid as quick as possible." (Docket Entry No. 38-8 at 4; Docket Entry No. 45-1 at p. 162). Shannon stated that she did not want to "tattle on Deborah," but because Mann approved Plaintiff's expense reports, Shannon "wanted to let [Mann] know." Id. Shannon suggested to Mann that "[i]f she is needing her money faster than what she is getting it she can turn in an expense report every week instead of holding all the expenses for months/weeks and then needing her money to be reimbursed faster than our policy allows." Id.

On November 1, 2012, Plaintiff contacted Paula Farrell, Suncrest's regional administrator, about Plaintiff's expense reports. (Docket Entry No. 41 at ¶ 12). Plaintiff explained that Shannon advised her "to always go to you [Farrell] for any problems with my checks in the future." (Docket Entry No. 38-11 at 2). Farrell responded with a copy to Mann, "I do not mind at all following up on this for you but I really think Janene should be the one to keep track of this." Id. In response to Farrell, Mann stated that she would discuss the issue with Plaintiff later and that "[i]t was not necessary for [Plaintiff] to bother Paula with this. Paula, I am sorry." Id. at 1.

On November 1, 2012, Plaintiff met with Mann concerning Plaintiff's performance, namely: "(i) not following policy on expense reports; (ii) not responding to emails appropriately and timely and not keeping up with her daily schedule on Homecare CRM; (iii) not showing up to the Sage

5

Awards Luncheon; (iv) not keeping up with tasks in a timely manner; and (v) spending excessive time in the office or on the phone calling other Account Managers when she is stressed about her referrals." (Docket Entry No. 41 at ¶ 13). Of the issues, Mann discussed the second, third and fifth with Plaintiff on October 23, 2012. (Docket Entry No. 38-12). Thus Plaintiff's employee discipline form is marked as a "First Warning (Verbal)" with an attachment that contains a description of issues discussed. Id. Mann prepared the document "about one week before" the meeting, and at the time was unaware of Plaintiff's need for shoulder surgery or any related medical care. (Docket Entry No. 38-8, Mann Declaration at ¶ 6).

As to Plaintiff "not following policy on expense reports," Mann noted that expense reports should be approved by Mann and Suncrest's policy is not to contact the corporate office regarding expense reports. Id. at 2. Mann explained, "Deborah has been verbally told and also in e-mails along with all the marketing team to please follow the appropriate process for expense reports." Id. at 2. On Plaintiff "not responding to emails appropriately and timely and not keeping up with her daily schedule in Homecare CRM," Mann stated, "Deborah has not answered her e-mails timely or meeting requests timely. Deborah at times when answering e-mails, they are extremely difficult to understand as far as the spelling and verbage. ... [Deborah] needs to put her personal physician appointments on her schedule on Homecare CRM[.]" Id. at 3. Plaintiff responded that she did timely answer emails, spelling errors may be "a P.C. problem" and she began keeping a schedule of her personal physician appointments since she was instructed to on October 23, 2012. Id. at 1. For Plaintiff not showing up at the awards luncheon, Plaintiff explained that she "became ill before and close to time of lunch and went to ER as for not notify (sic) Janene – I was having chest pain and went to ER." Id. at 1. As to the fourth issue, Plaintiff not keeping up with tasks in a timely manner,

Plaintiff was instructed to submit a monthly checklist to Mann to show that all items were completed. Id. at 4. For Plaintiff's excessive time in the office or on the telephone with other Account Managers, Mann "told [Plaintiff] that we have very few hours per day to make marketing calls" and Mann needed Plaintiff "to make as many calls as possible per day instead of spending time on the phone." Id. at 4.

In "Additions" to this report, Mann wrote that "Deborah will be taking off a couple of weeks for some needed surgery the first part of December," and that Mann would be handling her accounts during that time. Id. at 5. In her conclusion, Mann stated: "Deborah has brought some new referral sources to SunCrest and we are very appreciative and want to do all we can to help Deborah be successful and we want to help her improve in these areas listed above." Id.

On November 7, 2012, Plaintiff contacted Liliya Duncan, Suncrest's benefits administrator, about FMLA benefits. (Docket Entry No. 41 at ¶ 14). Duncan sent Plaintiff FMLA forms, including an FMLA fact sheet, a short term and long term disability claim form, an FMLA medical certification form, an FMLA eligibility notification, a letter from human resources regarding certain FMLA expectations and benefit premiums. Id. at ¶ 15. Plaintiff was informed that day that she was eligible for FMLA benefits, that she was eligible for up to twelve weeks of unpaid leave if she were approved for FMLA leave. (Docket Entry No. 41 at ¶¶ 16-18). Duncan advised Plaintiff that she could use some of her approved leave intermittently. Id.

On December 13, 2012, Plaintiff underwent shoulder surgery. (Docket Entry No. 41 at ¶ 24). Plaintiff's doctor recommended physical therapy for her shoulder two to three times a week for six to eight weeks, beginning December 16, 2012. Id. On January 2, 2013, Plaintiff returned to work. Id. Mann covered Plaintiff's territory while she was out during December and gave credit to Plaintiff

for the referrals that Mann obtained. (Docket Entry No. 38-5 at pp. 109-110). Plaintiff received a bonus in December 2012. (Docket Entry No. 45-2 at 37).

After returning to work, Plaintiff continued her physical therapy that caused her to report late for work. Id.; Docket Entry No. 45-1 at p. 98. Plaintiff never missed a physical therapy session because of work. Id. at pp. 97-98. Plaintiff did not request to receive any additional FMLA time for her physical therapy. (Docket Entry No. 41 at ¶ 24). Plaintiff completed therapy in late February or early March 2013. (Docket Entry No. 44, Plaintiff Declaration, at ¶ 5).

On January 14, 2013, Plaintiff received an annual performance evaluation from Mann. (Docket Entry No. 41 at ¶ 26; Docket Entry No. 38-3 at pp. 108-09). The evaluation is on a scale of one to four: a score of two means an employee "needs improvement;" three reflects that an employee "meets standards;" and four reflects that an employee "exceeds standards." (Docket Entry No. 38-17 at 1-2). Plaintiff received two fours for "displays a professional appearance and practices good personal hygiene" and "Annual Compliance Training completed." Id. Plaintiff scored mostly threes, with one two for "[a]ccomplishes job responsibilities in a professional and timely manner. Demonstrates attention to detail, thoroughness and accuracy of daily work. Completes high quality work in accordance with outlined standards within defined time frames." Id. For this category, Mann stated that "accomplishing job responsibilities in a professional and timely manner," most reflects an employee's attendance. (Docket Entry No. 45-6, Mann Deposition, at p. 60). Mann explained that "timely would be that you are out there each day and you are doing what you should do." Id.

In her "Evaluator's Comments" Mann noted Plaintiff's "good job of marketing Suncrest's Home Health Services and bringing on new referral sources," her "positive attitude and helpfulness,"

8

that Plaintiff has been "learning and implementing the Homecare CRM system," that she has been "very timely with her daily reports," and that she "is very much a team player." Id. at 4. Mann commented that Plaintiff's "challenges" were those "discussed in November and there has been significant improvement." Id. The evaluation includes a Referral/Goal Tracking Form, showing Plaintiff's referrals from January to November 2012. Id. at 9. Plaintiff's goal was met seven out of eleven months, and a handwritten note reflects that on average Plaintiff exceeded her 18 medicare referral goal/quota. Id. Plaintiff received a bonus in January 2013 for exceeding her quotas. (Docket Entry No. 45-2 at 37).

On February 4, 2013, Mann emailed several employees, including Plaintiff, about the Homecare CRM system and the need to complete schedules. (Docket Entry No. 41 at ¶ 28). On February 26, 2013, Mann saw Plaintiff at a hospital with Plaintiff's husband whose mother was undergoing a medical procedure. Id. at ¶ 29. That afternoon, Mann emailed Plaintiff, stating that she "was just doing my run through Homecare CRM for everyone" and for Plaintiff noticed that Plaintiff's last schedule entry on February 8, 2013 was 1:15PM, on February 13, 2013 was 10:00AM, on February 18, 2013 was noon and on February 20, 2013 it was at 3:00PM. (Docket Entry No. 38-19 at 1). Mann also stated that she "noticed several days a month [Plaintiff's] last call is around 3:00 p.m." and that "[i]t would be good if [Plaintiff] could make calls at least until 4-4:30PM." Id. Mann noted that if Plaintiff were completing another work activity, she should enter it on the schedule. Id. Mann also stated that if Plaintiff was "unable to work," she should tell Mann so paid time off leave could be used, as "[w]e are expected to work from 8-5 every day." Id. at 1-2. Plaintiff responded: "I have noticed they pop up on other days. I really [have] to watch sometime no account

will come up I always work until 4/4:30 I'll ck back. I have had to go back before. Not sure what I touch to cause this I had a entire day disappear one day[.]" Id. at 1.

In March 2013, Randy Bauch and Rosie O'Donnell, who are vendors and networking professionals of Suncrest, contacted Mann. (Docket Entry No. 41 at ¶ 31). Bauch and O'Donnell told Mann of Plaintiff's statements that Mann was going to fire Plaintiff. Id.; Docket Entry No. 38-5, Mann Deposition at 13. Plaintiff also wrote on Bauch's Facebook page "[k]eep me in mind if you learn of anything. I wish you well with your new adventure." (Docket Entry No. 45-1 at pp. 203-04). Plaintiff disputes contacting Bauch or O'Donnell about a job or that she told anyone that Mann was going to fire her. Id. at pp. 200-05.

On March 21, 2013, Mann planned to meet with Plaintiff to counsel Plaintiff on her performance. (Docket Entry No. 38-5 at 24, 21). After two days of preparation, Mann had a binder with forms to help Plaintiff's organization. Id. at 21. Mann discussed with Harris the items for this meeting with Plaintiff and the reports from O'Donnell and Bauch. Id. at 24-25. During this conversation, Mann and Harris decided that "this wasn't the kind of professional behavior that [they] expect from [their] employees, and that it appeared [Plaintiff] did not want to be working with [them], despite all [Mann's] attempts to help [Plaintiff] be successful." Id. at 25. Harris discussed with Mann Plaintiff's prior discipline history. (Docket Entry No. 38-7 at 8). Mann advised that she "met with [Plaintiff] on numerous occasions trying to coach [Plaintiff]" and took disciplinary action against Plaintiff on one occasion. Id. Suncrest's disciplinary policy states:

> The following procedures are generally utilized with respect to discipline. The Agency practices progressive corrective discipline, and supervisor's coach and counsel employees on a regular basis. It is the established policy of the Agency that any conduct, in its view, that interferes with or adversely affects employment is sufficient grounds for disciplinary action. Depending on the conduct, disciplinary

steps may be enforced by the following methods and generally in the listed order: verbal warnings; written warnings; suspension; dismissal. An employee is required to sign a written warning to confirm that the warning and recommended correction were given to the employee.

Factors that may be considered in ascertaining the appropriate disciplinary steps include, but are not limited to:

- Seriousness of conduct
- Employment record
- Employee's ability and desire to correct conduct
- Action taken with respect to similar conduct by other employees
- Effect on patients
- Surrounding circumstances

(Docket Entry No. 45-4 at 31).

According to Harris, "progressive discipline is ... you take steps and depending on the seriousness of the matter, you will elevate it." Id. Harris further stated that "when you've got somebody who's responsible for selling your business, you can't have them out selling their own services to somebody else." Id. at 8-9. As a result, Harris approved Plaintiff's termination. (Docket Entry No. 38-5 at 19, 25). On March 21, 2013, Mann and Harris met with Plaintiff and terminated Plaintiff. (Docket Entry No. 45-1 at pp. 205-06).

Through the Tennessee Department of Labor and Workforce Development, Plaintiff requested separation information from Defendant. (Docket Entry No. 38-20; Docket Entry No. 45-2 at 37-38). In answer to the question "[w]hat was the final incident that caused the discharge," Mann answered "[p]osting on Facebook that she was looking for another job – calling reps and networking professionals asking for a job and saying I was going to fire her. She was also leaving work early for personal issues and not letting Janene Mann know – her supervisor." (Docket Entry No. 38-20 at 1, 3). In answer to the question "[d]id the claimant violate company policy," with a box to check

11

yes or no, Mann wrote "[l]ook at #1 and she left work early several days for personal issues without telling Janene Mann and was looking for another job on company time." Id. In answer to the question "[w]hat was the reason for the prior incident(s) of rule violation, unacceptable behavior, absenteeism or lateness," Mann answered, "Deborah Carney said she didn't put anything on Facebook and didn't talk to anyone but at the end of the conversation, she did say that she talked to Rosie and said that she may be in trouble. She also said she didn't put anything on Facebook but it was on there and several saw it." Id.

Plaintiff does not know of any Suncrest employees who took FMLA leave. (Docket Entry No. 45-1 at p. 102). Plaintiff admits that no one threatened to fire her at any time due to her use of FMLA benefits. Id. Plaintiff admits that she did not complain to anyone at Suncrest that she felt discriminated against or retaliated against because of her use of FMLA benefits. Id. at p. 103. Plaintiff stated that she "didn't want to be retaliated against" and "didn't want to tell one person and they tell another person and they tell another person, so [she] just stayed quiet." Id. Plaintiff admits that at the termination meeting she did not mention any concerns about retaliation because of her use of FMLA benefits. Id. at pp. 103-04.

Plaintiff identified co-workers Elizabeth McAllister and Bob Colvert with performance issues. (Docket Entry No. 38-3, Plaintiff's Deposition at 6-7). According to Plaintiff, McAllister was late to meetings and "did not turn in or do her computer work on time." Id. at 7. Colvert had problems meeting his referral quota. Id. at 8. Plaintiff admits that she was only aware of McAllister's and Covert's performance issues through her own observation and what they chose to tell her. Id. at 6-11, 57-59. Plaintiff did not sit in on any meetings of her co-workers and their supervisors and was unaware of what behaviors a supervisor may have approved. Id. Mann admits

Id. Mann admits that Colvert consistently did not make his quota. (Docket Entry No. 38-5 at 4-5). Mann stated that Colvert, as a new employee, was given time to "ramp up" to meet his quotas and that Colvert was given time to gain business because his territories were changed. Id. Colvert was placed on probation for under-performing. (Docket Entry No. 45-6 at p. 68). Plaintiff admits that Colvert was eventually fired. (Docket Entry No. 41 at ¶ 39; Docket Entry No. 38-3 at 8-9).

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

13

477 U.S. at 247-48 (emphasis in original). Earlier the Supreme Court defined a material fact for

Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery,

the party opposing the motion must make an affirmative showing of the need for additional

discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d

351, 355-57 (6th Cir. 1989). But see Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any,"
> which it believes demonstrate the absence of a genuine issue of material fact.
> ... [W]e find no express or implied requirement in Rule 56 that the moving
> party support its motion with affidavits or other similar materials negating the
> opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant

14

has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex, 477 U.S. at 323 and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . . .

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the <u>onus</u> of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted).

It is likewise true that:

In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791

F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire

record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party has "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff has presented sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law.

Plaintiff asserts claims for FMLA interference and retaliation. For an interference claim, absent direct evidence, Plaintiff must prove that: "'(1) [s]he was an eligible employee, (2) defendant was a covered employer, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave defendant

notice of [her] intent to take leave, and (5) the defendant denied [her] FMLA benefits or interfered with FMLA rights to which [s]he was entitled.'" Harris v. Metro. Gov't of Nashville and Davidson Cnty., Tenn., 594 F.3d 476, 482 (6th Cir. 2010) (citation omitted). Under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), if Plaintiff establishes her prima facie case, then the burden shifts to Defendant to prove a legitimate, nondiscriminatory reason for its decision. If Defendant successfully carries this burden, then Plaintiff must show that Defendant's stated reasons are a pretext for its unlawful conduct. Donald v. Sybra, Inc., 667 F.3d 757, 761-62 (6th Cir. 2012); Jaszczyszyn v. Advantage Health Physician Network, 504 F. App'x 440, 447-448 (6th Cir. 2012).

"[T]o qualify as an eligible employee, an individual must have worked for at least 12 months – and at least 1,250 hours during the previous 12-month period – for a covered employer. A covered 'employer,' in turn, comprises 'any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees [within 75 miles of the worksite] for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.'" Grace v. USCAR, 521 F.3d 655, 661 (6th Cir. 2008) (quoting 29 U.S.C. § 2611(2), (4)). Defendant assumes "for the sake of this summary judgment motion only, that Plaintiff can establish the first four elements of her prima facie case of FMLA interference, but argues that Plaintiff was denied benefits or denied any FMLA right to which she was entitled." (Docket Entry No. 38-2, Defendant's Memorandum in Support of Motion for Summary Judgment at 4).

Here, Plaintiff cannot establish a prima facie claim of interference with her FMLA leave because Plaintiff received all FMLA leave she requested and she was not on FMLA leave when she was terminated. Travers v. Cellco P'ship, 579 F. App'x 409, 415 (6th Cir. 2014) ("Because

[Plaintiff] received all the FMLA leave that she requested (and thus was not denied benefits as a result of any alleged violation), [Plaintiff] has not demonstrated prejudice."); see also Culpepper v. BlueCross BlueShield of Tenn., Inc., 321 F. App'x 491, 496 (6th Cir. 2009) ("'[The plaintiff's] FMLA [interference] claim ... must fail. Culpepper received exactly what her doctor ordered – six days of FMLA leave.'").

Plaintiff relies upon Wysong v. Dow Chemical Company, 503 F.3d 441 (6th Cir. 2007), contending that an interference claim arises when FMLA leave is a factor in an employee's termination. In Wysong, a plaintiff's claim that she was terminated for taking FMLA leave was cognizable under the 29 U.S.C. § 2615(a)(1)-interference theory. The Sixth Circuit explained that employers "are prohibited from interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right. This prohibition includes retaliatory discharge for taking leave." Id. at 447 (quoting Chandler v. Specialty Tires of Am. (Tenn.), Inc., 283 F.3d 818, 825 (6th Cir. 2002) (citations omitted)). The Court stated that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." Id. at 447.

In Wysong, the defendant's regional medical director placed the plaintiff on work restrictions due to the plaintiff's neck problems. Id. at 444. Because the plaintiff could not be assigned to a job consistent with the work restrictions, the plaintiff was told not to come into work. Id. The defendant's medical review board informed the plaintiff that she would need to pass a functional capacity exam ("FCE") as a condition of returning to work. Id. at 445. The defendant's medical director informed the plaintiff that she could not take the FCE unless she stopping taking all pain medications for two weeks. On the advice of one of her physicians, the plaintiff refused. As a result,

20

the defendant refused to give the plaintiff the FCE and eventually terminated the plaintiff because her medical leave of absence status was for a continuous period of six months. Id. The Sixth Circuit summarized the plaintiff's claim as follows:

> Wysong's theory is that she was eventually terminated because of her taking FMLA leave in 2002. Wysong asserts that Dr. Teter wrote the work restrictions, in part, as a result of his knowledge that she had taken significant leave time in the past. The work restrictions prevented her from working, and she states that she could not comply with Dow's mandate that she go off all pain medications for two weeks before taking the FCE. Because she was not reporting to work, Dow terminated her. According to Wysong, this chain of events indicates that Dow used her 2002 FMLA leave time as a negative factor in its decision to terminate her.

Id. at 447-48.

Here, there is not any evidence that the Defendant considered Plaintiff's FMLA leave in its termination decision. Contrary to Wysong, where the plaintiff was prevented from returning to work, Plaintiff was reinstated to her former position. Plaintiff was not denied FMLA leave nor leave for any physical therapy. Therefore, the Court concludes that Plaintiff's FMLA claim for interference lacks proof to support a judgment on that claim.

As to Plaintiff's FMLA retaliation claim, Plaintiff must prove that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 556 (6th Cir. 2006) (citing Arban, 345 F.3d at 404). As with an interference claim, the McDonnell Douglas burden shifting framework applies. Jaszczyszyn, 504 F. App'x at 447-448.

Plaintiff fails to identify any statement of a decision maker to support as direct evidence of discrimination. See Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006) ("'Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' It does not require the fact finder to draw any inferences to reach that conclusion.") (quoting Kocak v. Cmty. Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005)). Plaintiff stated that no one threatened to fire her at any time because of her use of FMLA benefits. (Docket Entry No. 45-1 at p. 102). Plaintiff also stated that she did not complain to anyone at Suncrest that she felt discriminated against or retaliated against because of her use of FMLA benefits. Id. at p. 103.

If Defendant presents proof of a legitimate reason for Plaintiff's termination, under the McDonnell Douglas framework, the burden shifts to Defendant to show a legitimate, non-discriminatory reason for the adverse employment action. Donald, 667 F.3d at 762. Defendant asserts that Plaintiff was terminated due to performance issues and inappropriate contact with vendors. Unprofessional behavior and performance issues are legitimate, non-discriminatory motives for terminating an employee. See Yazdian v. ConMed Endoscopic Tech., Inc., 793 F.3d 634, 651 (6th Cir. 2015) ("ConMed has asserted legitimate, nondiscriminatory motives for terminating Yazdian's employment – insubordination and 'unprofessional behavior.'"); Danielson v. City of Lorain, 938 F.2d 681, 683 (6th Cir. 1991) ("The district court found, and we also conclude, that the City articulated a legitimate, nondiscriminatory reason for dismissing her – poor work performance.").

The burden now shifts to Plaintiff to demonstrate that Defendant's proffered reason for her termination was a pretext for Defendant's unlawful action. A plaintiff can show pretext "by showing

that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." Donald, 667 F.3d at 762 (citing Grace, 521 F.3d at 670). "'[A] reason cannot ... be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.'" Seeger, 681 F.3d at 285 (citation omitted).

Defendant contends that there is not a causal connection between Plaintiff's FMLA activity and her termination, as Plaintiff had performance issues prior to November 7, 2012 and subsequent to that time. Plaintiff relies upon the temporal proximity of her intermittent FMLA leave and her termination as establishing a causal connection. According to Plaintiff, she completed therapy in late February or early March 2013. (Docket Entry No. 44 at ¶ 5).

"'[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.'" Seeger, 681 F.3d at 283 (quoting DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004)). Yet, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." Donald, 667 F.3d at 763 (citation omitted).

As to other proof of pretext, Plaintiff contends that she did not contact anyone about other employment. Mann asserts that Randy Bauch and Rosie O'Donnell informed her about Plaintiff's employment inquiries. Assuming misunderstandings about Bauch and O'Donnell, Mann's belief is sufficient to prove a legitimate business reason. "The ground rules for application of the honest belief rule are clear. A plaintiff is required to show 'more than a dispute over the facts upon which the discharge was based.'" Seeger, 681 F.3d at 285 (quoting Braithwaite v. Timken Co., 258 F.3d 488, 493-94 (6th Cir. 2001)). "'Rather, the key inquiry is whether the employer made a reasonably

informed and considered decision before taking an adverse employment action.'" Id. (quoting Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)). Moreover, "[a]s long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'" Id. at 285-86 (citations omitted). Plaintiff's proof does not show Defendant's stated reason for Plaintiff's termiantion to be pretextual.

The Defendant also terminated Plaintiff for unapproved absences without prior notice to Plaintiff's supervisor. Plaintiff states: "Mann acknowledged that she did not know whether or not Plaintiff was exercising FMLA leave on the various other days that she believed Plaintiff left work for personal reasons, but merely believed that she 'was not working enough.' Plaintiff did speak with Mann about her therapy schedule and adhered to the very limited guidance regarding intermittent leave she received from Duncan." (Docket Entry No. 42 at 15). Yet, Plaintiff does not contend that she was exercising FMLA leave on the days that Mann noted her absences. Thus, Plaintiff fails to demonstrate a connection between her absences and her use of FMLA leave.

Finally, Defendant asserts that Plaintiff was fired for performance issues. Defendant cites Plaintiff's discipline in June 2012 and November 2012 as well as her lack of improvement. Plaintiff asserts that she only began receiving negative performance evaluations after she requested FMLA leave.

Although Plaintiff's May 2012 evaluation was favorable, on November 1, 2012, Plaintiff received a disciplinary "First Warning" that listed several performance issues. (Docket Entry No. 38-12). This meeting was two days after Plaintiff informed Mann that she would need shoulder surgery, though Mann asserts that she began preparing for this meeting a week prior. (Docket Entry

24

No. 38-8 at ¶ 6). Mann cited Plaintiff's issues with expense reports, untimely emails, failure to update Plaintiff's daily schedule on tasks and goals, and excessively calling co-workers. (Docket Entry No. 38-12). Three of these issues were discussed on October 23, 2012, almost a week before Plaintiff informed Mann that she would need shoulder surgery. (Docket Entry No. 38-12). The expense report issue arose on October 30, 2012, and Shannon notified Mann on October 31, 2012.

Plaintiff further asserts that the number of doctors that she visited played a crucial role in determining the number of referrals she could obtain and that her physical therapy while on intermittent leave had a direct impact on the number of referrals she obtained during that time frame. (Docket Entry No. 44, Plaintiff's Declaration at ¶¶ 7-8). Mann also told Plaintiff that "[t]he rule of thumb is that the more calls you make, the more opportunities you have for referrals." (Docket Entry No. 38-12 at 4). Yet, Plaintiff had low referral numbers before her injury. In June 2012, Mann and Plaintiff met to address issues with Plaintiff's referral numbers, and Mann advised Plaintiff of the need to solicit new accounts. (Docket Entry No. 41 at ¶ 4; Docket Entry No. 45-1 at p. 134). On January 14, 2013, Plaintiff's annual performance review indicated that she had failed to meet her quota in January, February, May and September of 2012. (Docket Entry No. 38-17 at 9). Yet, Plaintiff received a bonus in January 2013.

Plaintiff further asserts that Defendant did not follow its progressive discipline policy with Plaintiff. Plaintiff asserts that if there were a performance issue, she should have been placed on probation as was her coworker Bob Colvert. (Docket Entry No. 47 at ¶ 49). The progression of discipline, however, is not mandatory and states: "[d]epending on the conduct, disciplinary steps may be enforced by the following methods and generally in the listed order: verbal warnings; written warnings; suspension; dismissal." (Docket Entry No. 45-4 at 31). Colvert's situation was different,

as Colvert was new to the position and he was given time to "ramp up" because his accounts were later changed. Id. Although Colvert was also eventually terminated for not meeting his quotas, as a probationary employee Colvert is not comparable to Plaintiff. Thus, Plaintiff's proof fails to establish that she is "similarly-situated to the non-protected employee in all relevant respects," including his specific history of performance issues and his special circumstances. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998).

Finally, Plaintiff's was not terminated for her absences. Plaintiff was disciplined for not keeping up with her schedule. Mann told Plaintiff that if Plaintiff was "unable to work," Plaintiff should notify Mann so leave could be used. (Docket Entry No. 38-19 at 1-2). Plaintiff has not presented any evidence to show nor does she assert that her unscheduled and undocumented absences were due to FMLA leave.

Accordingly, the Court concludes that Plaintiff has failed to meet her burden to prove that Defendant's legitimate, non-discriminatory reason for terminating her was a pretext for retaliation.

For these reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 38) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 30th day of September, 2015.

WILLIAM J. HAYNES, JR.
Senior United States District Judge